UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------X

HUI-WEN CHANG aka "WENDY CHANG",

        Plaintiff,

                                 **MEMORANDUM AND ORDER**

       -against-                    16-CV-2373 (KAM)(LB)


NEW YORK CITY DEPARTMENT OF EDUCATION,
JOHN FICALORA (individually and in his
capacity as agent), ROBERT KOURIL, and
GLORIA GRANT,

        Defendants.

--------------------------------------X

**MATSUMOTO, United States District Judge:**

        On May 9, 2016, plaintiff Hui-Wen ("Wendy") Chang commenced this action against the New York City Department of Education ("DOE"), the New York City Board of Education, the City of New York, Carmen Farina, John Ficalora, Eduardo Mandrano-Salas, Eric Levitan, Gloria Grant, Robert Kouril, and A.E., pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. 621 *et seq.*, and the Americans with Disabilities ("ADA"), 42 U.S.C. §§ 12112 *et seq.* (ECF No. 1, Complaint.)  On March 31, 2017, plaintiff filed an amended complaint against the DOE, Ficalora, Grant, and Kouril, bringing charges under Title VII, the ADA, 42 U.S.C. § 1983, the New York State Human Rights Law ("NYSHRL"),

N.Y. Executive Law § 296, and the New York City Human Rights Law

("NYCHRL"), N.Y.C. Admin. Code § 8-502(a), and alleging that she

was unlawfully subject to discrimination on the basis of race

and national origin and denied an accommodation for a

disability.  (ECF No. 16, Amended Complaint ("Am. Compl.).)

Pending before the court is defendants' motion for

summary judgment.  For the reasons set forth below, the court

grants in part and denies in part defendants' motion.

**BACKGROUND**

## I.  Factual Background

The facts in this section are taken from the

defendant's Rule 56.1 statement, plaintiff's response to

defendant's Rule 56.1 statement, and the parties' declarations

and exhibits, and they are considered in the light most

favorable to the non-moving party.

Plaintiff was hired by the DOE as a school librarian

in 1995 and was transferred to a position at Newtown High School

around 2003.  (ECF No. 32, Defendants' Statement Pursuant to

Local Civil Rule 56.1 ("Def. 56.1 Statement") ¶ 1.)  She is a

U.S. citizen who identifies as a Chinese Taiwanese American.

(*Id.* ¶ 2.)

Defendant Ficalora is the principal of Newtown High

School and has been so since 1991.  (*Id.* ¶ 3.)  In this

position, Ficalora is responsible for the students and staff,

hiring, evaluations, budgeting, guidance issues, attendance issues, and anything that occurs in the school. (*Id.*) Defendant Grant is a library media specialist at Newtown High School and has been since 2013. (*Id.* ¶ 4.) Defendant Kouril has been a special education teacher at Newtown High School since 1999. (*Id.* ¶ 5.)

## A. 2012-2013 School Year

Plaintiff alleges that she faced "blatant discrimination" based on her race and national origin on or about the first day of the 2012-13 school year because Ficalora and assistant principal Levitan ("Levitan"), who were greeting and shaking hands with other staff, turned away from plaintiff and refused to shake her hand when she entered the school. (*Id.* ¶ 7.) Plaintiff does not recall any other individual discriminating against her on the first day of that school year. (*Id.* ¶ 8.) Plaintiff believes that Ficalora and Grant turned their backs on her because she is Chinese, and concluded this because Levitan once asked her why she sees Chinese doctors, instead of American doctors. (ECF No. 39-1, Chang Deposition Transcript ("Chang Tr.") at 55-56.) Plaintiff does not know whether any other Chinese employees at Newtown High School were treated the same as she was on the first day of the 2012-13 school year. (ECF No. 36, Plaintiff's Counterstatement Pursuant to Local Civil Rule 56.1 ("Pl. Counterstatement") ¶ 10.)

Plaintiff alleges that Ficalora and Levitan ignored her when she invited them to a retirement party for another librarian during the 2012-13 school year, and that they did so because of her race and national origin. (Def. 56.1 Statement ¶ 11.) Plaintiff testified that they ignored her "because [she] threw the party and [she] just happen[s] to be a Chinese librarian who initiated to throw the party." (Chang Tr. at 62.)

Plaintiff alleges that Ficalora and Levitan did not authorize the school to join a "New York Library Program" during the 2012-13 school year because of her race and national origin. (Def. 56.1 Statement ¶ 1.) Plaintiff believes they did not join the program because she is "the only Chinese librarian" and that if she had transferred out of Newtown High School, "everything wouldn't happen because of [her] national origin." (*Id.* ¶ 14.) Plaintiff does not believe that any other incidents of discrimination occurred during the 2012-13 school year. (*Id.* ¶ 15.)

B. 2013-2014 School Year

On or about September 26, 2013, Grant addressed plaintiff as "China girl." (*Id.* ¶ 16.) On or about September 27, 2013, Grant asked plaintiff if Chinese people eat cockroaches. (*Id.* ¶ 17.) Grant asked plaintiff if she had a recipe, searched for one on the internet, and reported back that Chinese and Thai people eat roaches. (Pl. Counterstatement ¶

18.) These comments regarding roaches were made in front of students, one of whom wrote a statement stating that Grant's comments offended him "and other kids that were there." (Pl. Counterstatement ¶ 18; ECF No. 35-4, Ex. D.)

Plaintiff directed written and verbal complaints to Ficalora regarding Grant's September 26 and September 27 remarks. (Pl. Counterstatement ¶ 19.) Following the complaints, Ficalora had meetings with plaintiff and Grant regarding the incidents. (*Id.* ¶ 20.) Ficalora told Grant she should not use the term "China girl," and should instead use the term Asian. (ECF No. 39-3, Grant Deposition Transcript ("Grant Tr.") at 17, 20, 37.) When asked whether she met with Ficalora regarding the roach comments, Grant responded "Yes, that's the time he told me I should not speak like that. I should say Oriental, don't say Chinese." (Grant Tr. at 26; *see also id.* at 37 (explaining that "Asian," rather than "Oriental" was the term Ficalora suggested).[1]) Grant never reviewed an antiharassment or antidiscrimination policy while at Newtown High School. (Grant Tr. at 10.)

Ficalora testified that he believed Grant understood from their meeting that she could not use language that was

---

[1] The parties dispute whether Ficalora specifically addressed the roach commentary. (*See* Pl. Counterstatement ¶ 21.) It is not clear whether Grant meant that she was told not to make comments similar to the one about roaches or she and Ficalora discussed those comments when he told her not to say "China girl."

inappropriate. (ECF No. 39-2, Ficalora Deposition Transcript ("Ficalora Tr.) at 22.) No formal paperwork was placed in Grant's file regarding Chang's complaint. (*Id.* at 22-23.) Ficalora testified that he did not write a letter delineating the racial allegations made by plaintiff because "Ms. Chang has an issue with English and Ms. Grant definitely speaks with a Jamaican accent and with English expressions." (*Id.* at 37.) Ficalora's feeling after speaking with Chang and Grant was "that there [were] misunderstandings [and] that Ms. Grant had no intention of offending Ms. Chang, so [he] did not write to Ms. Chang." (*Id.*) Ficalora acknowledged that he is someone who reports complaints of discrimination under Chancellor Regulation A-830, though he did not know whether such reporting was mandatory or if he had a duty to do so. (*Id.* at 95-96.) Ficalora did not forward plaintiff's complaint regarding the "China girl" and roach comments to another body or agency within DOE. (*Id.* at 96.)

Other than the statements on September 26 and September 27, 2013, Grant did not make any other comments to plaintiff regarding her race, ethnicity, or national origin during the 2013-2014 school year. (Pl. Counterstatement ¶ 18.)

On October 30, 2013, Ficalora placed a letter in plaintiff's personnel file after he found that there was "sufficient evidence to conclude that [plaintiff had used]

inappropriate language and behaved in an unprofessional manner."
(Def. 56.1 Statement ¶ 22; ECF No. 31-6, Ex. F.)  The letter
reports that Ficalora met with plaintiff to discuss a complaint
he had received from Grant, in which Grant claimed that
plaintiff called her "a piece of shit."  (ECF No. 31-6, Ex. F.)
Grant responded that plaintiff was "a bigger piece."  (*Id.*)

Plaintiff asserts that Grant called her a "piece of
shit" first and that she merely repeated the insult back to
Grant in response.  (Pl. Counterstatement ¶ 22; ECF No. 31-6,
Ex. F.)  The letter states that Grant's "complaint indicated
that a staff member heard [plaintiff] say the words," and that
Ficalora "investigated and did receive confirmation."  (ECF No.
31-6, Ex. F.)  The letter further stated that plaintiff and
Grant would need to improve their working relationship, and that
they should deal with each other in a professional manner and
never use inappropriate language.  (*Id.*)

Plaintiff believes she received this letter because of
her prior complaint about Grant and because Ficalora had decided
to get rid of her.  (Pl. Counterstatement ¶ 22.)  Ficalora
testified that he did not recall receiving complaints about
plaintiff using inappropriate language before this incident.
(Ficalora Tr. at 25-26.)

On March 17, 2014, Ficalora placed a letter in
plaintiff's file, which noted that Grant had submitted a

complaint about plaintiff on February 4, 2014 and summarized a March 14, 2014 meeting plaintiff had with Ficalora regarding the complaint. (Def. 56.1 Statement ¶¶ 23-24; ECF No. 31-7, Ex. G.) The complaint stated that plaintiff had "held up [her] fists in a boxing position and asked [Grant] if [she] wanted to fight." (ECF No. 31-7, Ex. G.) Grant testified that she was waiting to pass by the plaintiff to get access to her locker, that she had said "oh, my God" because plaintiff was taking too long to open her locker in Grant's opinion, and that plaintiff then turned around and asked Grant if she wanted to fight. (Grant Tr. at 28-30.) Plaintiff denies holding up her fists or making this remark. (Pl. Counterstatement ¶ 23.)

Ficalora did not see plaintiff in a boxing position, but noted that a staff member observed that plaintiff's fists were clenched when she and Grant were in the hallway after the incident. (Ficalora Tr. at 32-33.) The letter stated that Ficalora concluded that Grant's complaint was credible and cautioned plaintiff that she should never threaten coworkers. (ECF No. 31-7, Ex. G.)

On or about April 18, 2014, plaintiff filed a complaint with the New York State Division of Human Rights ("NYSDHR") against Ficalora and Grant. (Def. 56.1 Statement ¶ 25.)

At the end of the 2013-14 school year, plaintiff received a satisfactory rating for her performance evaluation. (*Id.* ¶ 26.)

### C. 2014-2015 School Year

On September 16, 2014, the New York State Division of Human Rights issued a finding of "NO PROBABLE CAUSE" in response to plaintiff's April 18, 2014 charge of discrimination. (Def. 56.1 Statement ¶ 27.)

On October 24, 2014, Ficalora met with plaintiff to discuss an incident that took place on October 21, 2014. (*Id.* ¶ 28; ECF No. 31-10, Ex. J.) On October 31, 2014, a letter was placed into plaintiff's file describing the October 21 incident and the October 24 meeting. (ECF No. 31-10, Ex. J.) The letter states that following a conflict between plaintiff and Grant, "Ms. Grant ran into the hallway screaming for security[, and] Mr. Medrano, Assistant Principal, Security, responded." (*Id.*) Grant "indicated that [plaintiff] approached her in a threatening way and pushed something toward her face that appeared like a cell phone and that [plaintiff] quickly followed behind [Grant] as she moved toward the door." (*Id.*)

Plaintiff disputes the characterization of the event. (Pl. Counterstatement ¶¶ 28-29.) Ficalora testified that he was uncertain whether he substantiated that plaintiff shoved an item in Grant's face, aside from Grant's statement. (Ficalora Tr. at

29.)  Grant testified that plaintiff wanted to speak with her and "kept following [her] around" even though she indicated to plaintiff that she was not going to talk at that time.  (Grant Tr. at 27.)  Grant testified that she was scared and ran to Medrano's office.  (Grant Tr. at 28.)  Grant stated that she asked Medrano to talk to plaintiff and said her running away was a "real run."  (*Id.*)

On November 4, 2014, Ficalora requested a psychological medical review to evaluate plaintiff's fitness to work in a school.  (Def. 56.1 Statement ¶ 30.)  The reasons stated in the request included the following: plaintiff's October 21, 2014 incident involving Grant and Medrano; plaintiff's "diatribe about patriotism, freedom of speech and her love for [the United States]" when asked about the October 21, 2014 incident; plaintiff's raising of her fists in a fighting stance toward a colleague; harassing phone calls plaintiff made to a staff member after she asked whether the staff member knew who the head of the KGB was; comments made to that same staff member stating that Ficalora had a mind control device and that the school's phones were tapped; plaintiff's request to another staff member to use that person's cell phone because it was the only phone that was not tapped; plaintiff's confrontations with colleagues and students; plaintiff's claims that items were taken from her school locker and mysteriously

returned to her home; and plaintiff's report of a panic attack. (ECF No. 31-11, Ex. K.)

On November 10, 2014, Ficalora placed a letter in plaintiff's file in which he stated that she was late to a lesson on November 6, 2014, and that she had twice failed to report to Ficalora's office as requested within that week. (Def. 56.1 Statement ¶¶ 31-32.)

On or about January 7, 2015, plaintiff was involved in a physical altercation with a student; the student alleged that plaintiff pushed her and said "punch me." (*Id.* ¶ 33; ECF No. 31-13, Ex. M; ECF No. 31-14, Ex. N.) The student who alleged that plaintiff pushed her was not forced by anyone to make that allegation. (Def. 56.1 Statement ¶ 37.) Plaintiff and Ficalora discussed the incident on February 4, 2015, and she denied that she pushed a student. (Def. 56.1 Statement ¶ 35.) During the investigation of the incidents, ten students were interviewed, including students plaintiff requested statements from. (ECF No. 31-13, Ex. M.) In the letter to plaintiff's file regarding the incident, Ficalora concluded that the student statements were consistent and credible, and that plaintiff's behavior was against the Chancellor's Regulation A-420, which prohibits corporal punishment. (Def. 56.1 Statement ¶ 36; ECF No. 31-13, Ex. M.)

Plaintiff disputes that she told a student to punch her, and maintains that she was attacked by a student after she tried to stop the student from leaving the library through a door students were not allowed to use. (Pl. 56.1 Counterstatement ¶ 33.) A student sent plaintiff a video clip taken during the incident, which plaintiff forwarded to Ficalora's administrative assistant on February 11, 2015. (ECF No. 34, Chang Affidavit ("Chang Aff.") ¶ 5; ECF No 34-1, Ex. A.)

Ficalora testified that he heard there was a video of the incident, but that he never saw it and that plaintiff never sent it to him. (Ficalora Tr. at 20.) Ficalora also testified that he was uncertain whether plaintiff pushed the student and that he charged her with corporal punishment because she was blocking the door for no reason and antagonizing the student, which caused the incident to escalate, putting herself and students in danger. (*Id.* at 45-46.) The student was also suspended. (*Id.* at 18-19.)

On February 11, 2015, Ficalora placed a letter in plaintiff's file, which noted that plaintiff had failed to attend four scheduled periods of report card conferencing without approval on February 4, 2015. (Def. 56.1 Statement ¶ 38.)

Plaintiff began a leave of absence that started sometime before March 20, 2015 and ended on May 3, 2015. (ECF

12

No. 31-17, Ex. Q; ECF No. 31-23, Ex. W.)  On March 20, 2015,
plaintiff requested a "safety/hardship transfer from Newtown
High School in Queens based on a physical assault [she] suffered
by a student on January 7, 2015."  (Def. 56.1 Statement ¶ 40;
ECF No. 31-17, Ex. Q.)  Plaintiff's request stated that she had
"great fear and anxiety" and had recently taken time off to
"reduce anxiety based on advice of [her] doctors."  (ECF No. 31-
17, Ex. Q.)  The letter states that plaintiff's doctors strongly
suggested that she change her working environment to alleviate
the anxiety and fear she had of returning to the school.  (*Id.*)
The request stated that plaintiff was "subject to bullying and
harassment by staff members of the school on a frequent basis."
(*Id.*)  The letter also included plaintiff's desire to "be
transferred to another high school in Queens not far from [her]
home."  (*Id.*)

    In connection with the January 7, 2015 student
alteration, on April 24, 2015, plaintiff released the City of
New York, any and all past and present officers, directors,
managers, administrators, employees, agents, assignees, lessees,
and representatives of the City of New York from "any and all
claims, causes of action, suits, debts, sums of money, accounts,
controversies, transactions, occurrences, agreements, promises,
damages, judgments, executions, and demands whatsoever, known or
unknown, which [plaintiff] had, now has, or hereafter can,

13

shall, or may have against the RELEASEES for, upon or by reason

of any matter, cause or thing whatsoever that occurred through

[April 24, 2015]." (Def. 56.1 Statement ¶ 41; ECF No. 31-26,

Ex. Z.)

This general release resulted from plaintiff's filing

of a notice of claim on or about February 5, 2015, alleging

injuries in connection with the January 7, 2015 physical

altercation with a student. (*Ibid.*) Plaintiff was represented

by counsel when she filed the notice and when she signed the

general release. (Def. 56.1 Statement ¶ 41.)

On May 2, 2015, plaintiff's doctor diagnosed plaintiff

with Post Traumatic Stress Disorder ("PTSD") and Depressive

Disorder, and recommended that she be placed on "light duty."

(*Id.* ¶ 42.) Plaintiff's colleagues were not aware of her PTSD

diagnosis. (*Id.* ¶ 43.) On a single unspecified date sometime

in May 2015, defendant Kouril told plaintiff "you are crazy and

everyone knows it." (*Id.* ¶ 45.) Kouril, who made this

statement to plaintiff in the presence of another colleague, did

not know that plaintiff had been diagnosed with PTSD or that she

had any stress or anxiety issues. (*Id.* ¶ 46.)

On June 9, 2015, plaintiff was involved in another

physical altercation with a student. (*Id.* ¶ 47.) Plaintiff

allegedly approached a student, tapped the student's shoulder,

told the student to quiet down, and, when the student stood up,

told the student "go ahead and hit me." (*Id.*; ECF No. 31-19, Ex. S.) Plaintiff also kicked the student's backpack. (*Ibid.*) Plaintiff disputes this, claiming that the student physically attacked her. (Pl. Counterstatement ¶ 47.) Plaintiff was taken away in an ambulance and filed a police report regarding the incident. (*Id.*) The student was suspended. (Chang Tr. at 117.)

On June 18, 2015, plaintiff received an unsatisfactory end of year evaluation. (Def. 56.1 Statement ¶ 48.) A Chancellor's Committee Report found that the unsatisfactory rating was based on plaintiff's "repeated[] commi[ssion] of gross acts of professional misconduct." (ECF No. 31-21, Ex. U at 3.) The report cited the following incidents: plaintiff's physical altercations with and provocation of students; when plaintiff "harassed a fellow librarian" by following her and approaching in a threatening manner designed to intimidate; and plaintiff's failure to report to assigned teaching periods or meetings with Ficalora as directed. (*Id.*) Ficalora testified that the corporal punishment charge is what caused the unsatisfactory rating. (Ficalora Tr. at 61-62.) Plaintiff believes that the unsatisfactory rating was based on discrimination and retaliation for filing a complaint with the NYSDHR in April 2014. (Pl. Counterstatement ¶ 49.)

On June 26, 2015, plaintiff's March 20, 2015 hardship transfer request was denied. (Def. 56.1 Statement ¶ 50.) The same day, plaintiff again requested a safety/hardship transfer from Newtown High School, and included a doctor's note in her request. (*Id.* ¶ 51; ECF No. 31-23, Ex. W.) The letter requested the transfer "based on two physical assaults [plaintiff] suffered by two students on January 7 and June 9, 2015." (ECF No. 31-23, Ex. W.) This letter reiterates plaintiff's "great fear and anxiety" regarding returning to school and that plaintiff was "subject to bullying and harassment by staff members of the school on a frequent basis." (*Id.*) The letter stated that plaintiff wished to ne "transferred to another high school in Queens not far from [her] home." (*Id.*)

On August 21, 2015, plaintiff's hardship transfer request was denied. (Def. 56.1 Statement ¶ 52.) Plaintiff testified that she was aware of vacant positions she could have been transferred to, that she saw a couple of them in the Bronx, and that she applied to but was not accepted to them. (Chang Tr. at 112-13.)

D. 2015-2016 School Year

On October 5, 2015, the Chancellor's Committee recommended that plaintiff's appeal of her unsatisfactory rating be denied and the rating sustained. (ECF No. 31-21, Ex. U.) On

or about October 8, 2015, plaintiff stopped going to work. (Def. 56.1 Statement ¶ 54; ECF No. 38-2, Ex. B.) On October 13, 2015, plaintiff's doctor diagnosed plaintiff as "fully disabled at [that] time and . . . unable to return to her job . . . due to Post-Traumatic Stress Disorder and Depressive Disorder." (ECF No. 38-1, Ex. A.)

On March 22, 2016, Ficalora requested a medical evaluation to determine plaintiff's mental and physical capacity to perform her duties. (ECF No. 38-2, Ex. B.) The letter lists the following reasons for the request: plaintiff's absence from work for 96 days, since October 7, 2015, after she had a breakdown in Ficalora's office; plaintiff's confrontations with students that resulted in physical altercations, student suspensions, and harm to plaintiff; constant conflicts with Grant, including threats of physical harm; harassing phone calls made to a staff member after the staff member told plaintiff she did not know who the head of the KGB is; and plaintiff's comments to a staff member that Ficalora had a mind control device and that the school's phones were being tapped. (*Id.*)

On April 12, 2016, as a result of the medical fitness evaluation, plaintiff was found unfit to work. (Def. 56.1 Statement ¶ 55; ECF No. 31-25, Ex. Y.) The evaluation also determined that plaintiff's absence since October 8, 2015 was "medically justified as personal illness." (ECF No. 31-25, Ex.

17

Y.)  Plaintiff does not believe she will ever be well enough to
return to work.  (Def. 56.1 Statement ¶ 56.)  Plaintiff
maintains that because she "was forced to leave her position
prior to reaching the age of 55, [her] pension is about two-
thirds of what it would have been had she been able retire at or
after age 55."  (Pl. 56.1 Counterstatement ¶ 57.)

## LEGAL STANDARD

### I.  Motion for Summary Judgment

Summary judgment is appropriate where "the movant
shows that there is no genuine dispute as to any material fact,"
Fed. R. Civ. P. 56(a), "and the facts as to which there is no
such issue warrant the entry of judgment for the moving party as
a matter of law." *Kaytor v. Electric Boat Corp.*, 609 F.3d 537,
545 (2d Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S.
317, 322–23 (1986).  "All ambiguities must be resolved in favor
of the non-moving party and all permissible inferences from the
factual record must be drawn in that party's favor." *Zalaski v.
City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir.
2010).

If the moving party can show that "there is no genuine
issue as to any material fact and that it is entitled to
judgment as a matter of law, the nonmoving party must come
forward with specific facts showing that there is a genuine
issue for trial." *Peterson v. Regina*, 935 F. Supp. 2d 628, 634

18

(S.D.N.Y. 2013) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

To defeat a motion for summary judgment, the non-moving party must identify probative, admissible evidence from which a reasonable factfinder could find in his favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-257 (1986).  It "requires the nonmoving party to go beyond the pleadings and by [his or] her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  477 U.S. at 261 n.2 (citations omitted).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. . . . [I]t is the substantive law's identification of which facts are critical and which facts are irrelevant that governs."  477 U.S. at 248.  If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper.  *Chambers v. TRM*

*Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994) (citations omitted).

The Second Circuit has "repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case where . . . the merits turn on a dispute as to the employer's intent." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). "Where an employer has acted with discriminatory intent, direct evidence of that intent will only rarely be available, so that 'affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.'" *Id.* (citing *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994)). But "[e]ven in the discrimination context, however, a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Id.* (citing *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)).

**DISCUSSION**

## I.  Effect of Waiver

Defendants argue that the release plaintiff signed bars plaintiff's claims that arise from events that occurred on or before April 24, 2015. (ECF No. 30, Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Def. Mem." at 4-8.) Plaintiff argues that she only intended to release the City of New York from financial liability related to the

injuries she received on January 7, 2015 during the altercation with a student. (ECF No. 33, Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Opp.") at 9.) Plaintiff argues that the release is a boilerplate form that does not mention the defendants or disputes other than plaintiff's notice of claim for the January 7, 2015 incident. (Opp. at 9-10.)

"Under New York law, a release that is clear and unambiguous on its face and which is knowingly and voluntarily entered into will be enforced." *Pampillonia v. RJR Nabisco, Inc.*, 138 F.3d 459, 463 (2d Cir. 1998). "With unambiguous contracts, a party's subjective intent and understanding of the terms is irrelevant." *HOP Energy, L.L.C. v. Local 553 Pension Fund*, 678 F.3d 158, 162 (2d Cir. 2012). "Where the language of [a] release is clear, effect must be given to the intent of the parties as indicated by the language employed." *Tromp v. City of New York*, 465 F. App'x 50, 51 (2d Cir. 2012) (citations & internal quotation marks omitted).

"Words of general release are clearly operative not only as to all controversies and causes of action between the releasor and releasees which had, by that time, actually ripened into litigation, but to all such issues which might then have been adjudicated as a result of pre-existent controversies." *Id.* at 52 (citations & internal quotation marks omitted). When

the release contains general language, "the release is to be construed most strongly against the releasor." *Id.* "Courts in this Circuit have consistently barred claims where a plaintiff enters into a settlement, executes a general release, and then brings an additional lawsuit alleging similar claims that could have been alleged in the prior settled action." *Dechberry v. New York City Fire Dep't*, 124 F. Supp. 3d 131, 142 (E.D.N.Y. 2015).

A release that "does not expressly state that the agreement constitutes a waiver of the right to file *any* legal claim against the employer" is not a general release that should be broadly construed. *See Dash v. Bd. of Educ. of City Sch. Dist. of New York*, 238 F. Supp. 3d 375, 390 (E.D.N.Y. 2017) (emphasis in original). But the "mere recitation of the specific claims underlying a settlement will not undermine the broad prophylactic effect of general release language." *Vornado Realty Tr. v. Marubeni Sustainable Energy, Inc.*, 987 F. Supp. 2d 267, 278 (E.D.N.Y. 2013). "Summary judgment is appropriate only when the contractual language is 'wholly unambiguous.'" *Graham v. Empire Bail Bonds*, 2010 WL 1849295, at *2 (E.D.N.Y. May 7, 2010). "The proper interpretation of an unambiguous contract is a question of law for the court, and a dispute on such an issue may properly be resolved by summary judgment." *Omni Quartz, Ltd. v. CVS Corp.*, 287 F.3d 61, 64 (2d Cir. 2002).

The release plaintiff signed is unambiguous.
Plaintiff agreed to "release and forever discharge . . . any and
all claims, causes of action, suits, debts, sums of money,
accounts, controversies, transactions, occurrences, agreements,
promises, damages, judgments, executions, and demands,
whatsoever, known or unknown, which RELEASOR had, now has or
hereafter can, shall, or may have against the RELEASEES for,
upon or by reason of any matter, cause or thing whatsoever that
occurred through the date of this RELEASE."  (Def. 56.1 ¶ 41;
ECF No. 31-26, Ex. Z.)  The releasees were the "City of New
York, and all past and present officers, directors, managers,
administrators, employees, agents, assignees, lessees, and
representatives of the City of New York, and all other
individually named defendants and entities represented and/or
indemnified by the City of New York[.]"  (*Id.*)

        The release was dated April 24, 2015.  The defendants
in this case are releasees whose actions through April 24, 2015
were covered by the release.  Although the release identifies
plaintiff by reference to her claim, it does not contain
language cabining the release to that claim.  Moreover, though
the clear language alone suffices, the court notes that
plaintiff was represented by an attorney, and already had raised
allegations of mistreatment on the basis of race and national

origin when she signed this general release.  (*See* ECF No. 31-8, Ex. H; ECF No. 31-9, Ex. I.)

Defendants are entitled to summary judgment on any and all of plaintiff's claims, suits, actions, and all other specified matters based on events occurring prior to April 24, 2015, because they are barred by the clear terms of the general release.  These actions include plaintiff's selective enforcement and race and national origin discrimination claims to the extent that the underlying events upon which the claims are based occurred before April 24, 2015.

## II.  Race & National Origin Discrimination in Violation of Title VII and the NYSHRL

The court considers whether defendant is entitled to summary judgment on plaintiff's claims of race and national origin discrimination based on conduct that occurred after April 24, 2015.

Under the Supreme Court's *McDonnell Douglas* framework, "a plaintiff must first establish a *prima facie* case of discrimination by showing: (1) she belonged to a protected class, (2) was qualified for the position she held or sought, and (3) suffered an adverse employment action (4) under circumstances giving rise to an inference of discriminatory intent."  *Fanelli v. New York*, 200 F. Supp. 3d 363, 370 (E.D.N.Y. 2016) (citing *Terry v. Ashcroft*, 336 F.3d 128, 137-38

24

(2d Cir. 2003)). "This burden is minimal and does not require specific evidence of discrimination." *Brown v. Baldwin Union Free Sch. Dist.*, 603 F. Supp. 2d 509, 514 (E.D.N.Y. 2009) (citing *Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006)). "Claims brought under the NYSHRL are analyzed identically and the outcome of an employment discrimination claim made pursuant to the NYSHRL is the same as it is under . . . Title VII." *Hyek v. Field Support Servs., Inc.*, 461 F. App'x 59, 60 (2d Cir. 2012) (citing *Smith v. Xerox Corp.*, 196 F.3d 358, 363 n.1 (2d Cir. 1999), *overruled on other grounds by Meacham v. Knolls Atomic Power Lab*, 461 F.3d 134, 140-41 (2d Cir. 2006)) (internal quotation marks omitted).

"A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment." *Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006) (citation and internal quotation marks omitted). "Examples of materially adverse employment actions include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004) (alternation, citation, and internal quotation marks omitted). *See also Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir.

2015) ("A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment."); *Rasko v. New York City Admin. for Children's Servs.*, 734 F. App'x 52, 54 (2d Cir. 2018) ("Informal discipline, criticism, or counseling does not constitute an adverse act if no change in working conditions accompanies it.").

"If the plaintiff establishes a *prima facie* case, the burden then shifts to the employer to 'articulate some legitimate, nondiscriminatory reason for [the adverse act].'" *Whethers v. Nassau Health Care Corp.*, 956 F. Supp. 2d 364, 375 (E.D.N.Y. 2013) (citing *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 499 (2d Cir. 2009)), *aff'd,* 578 F. App'x 34 (2d Cir. 2014). "The employer's burden of showing a legitimate non-discriminatory reason for its actions is not a particularly steep hurdle." *Id.* "Should the employer satisfy its burden, the *McDonnell Douglas* framework and its presumptions and burdens disappear, leaving the sole remaining issue of 'discrimination *vel non*.'" *Fanelli v. New York*, 200 F. Supp. 3d 363, 371 (E.D.N.Y. 2016) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)).

"To rebut an employer's proffered non-discriminatory rationale for its actions and withstand summary judgment, a plaintiff must present more than allegations that are

'conclusory and unsupported by evidence of any weight.'" *Id.*
(citing *Smith v. Am. Ex. Co.*, 853 F.2d 151, 154-55 (2d Cir.
1988)). *See also Chan v. Donahoe*, 63 F. Supp. 3d 271, 297
(E.D.N.Y. 2014) (citing *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d
834, 845 (2d Cir. 2013)) ("In order to successfully rebut an
employer's purported non-discriminatory reason for the
employment action, the plaintiff must establish pretext.").
"Thus, when the district court considers whether the evidence
can support a verdict of discrimination on a motion for summary
judgment, it 'must analyze the evidence, along with the
inferences that may be reasonably drawn from it, and decide if
it raises a jury question as to whether the plaintiff was the
victim of discrimination.'" *Grady v. Affiliated Cent., Inc.*,
130 F.3d 553, 560 (2d Cir. 1997) (citing *Fisher v. Vassar
College*, 114 F.3d 1332, 1347 (2d Cir. 1997)).

  Defendants argue that the disciplinary letters and
negative employment evaluations plaintiff received to do not
qualify as adverse employment actions because they did not
result in changes to the conditions of plaintiff's employment.
(Def. Mem. at 11-13.) Plaintiff argues that the disciplinary
letters were themselves adverse actions. (Opp. at 15-16.)
Plaintiff argues that the corporal punishment charges are
adverse actions that will remain on plaintiff's record and
likely prevent plaintiff from obtaining employment in the same

field. (*Id.* at 14-15.) Plaintiff generally suggests that Ficalora's actions and determinations were based on incorrect and biased assessments. (*Id.*) Plaintiff argues that she lost her job and received a reduced pension as a result of the medical evaluation that Ficalora requested, and further asserts that the examination was requested based on her conflicts with Grant (to whom she apportions fault). (*Id.*)

Plaintiff has not established that she suffered an adverse employment action. "In the context of a discrimination claim, negative evaluations, criticism and unwanted scrutiny are not adverse employment actions absent a showing that such actions affected the terms and conditions of the plaintiff's employment." *Spaulding v. New York City Dep't of Educ.*, 2015 WL 12645530, at *35 (E.D.N.Y. Feb. 19, 2015), *report and recommendation adopted,* 2015 WL 5560286 (E.D.N.Y. Sept. 21, 2015). *See also id.* (explaining that the teacher plaintiff's failure to provide evidence that her unsatisfactory rating for the school year affected the terms and conditions of employment meant she had not established that an unsatisfactory rating was an adverse employment action for purposes of a discrimination claim).

There is no evidence that plaintiff's receipt of the disciplinary letters, including the corporal punishment charges, and unsatisfactory rating resulted in her termination. The

plaintiff challenged her unsatisfactory rating, which did not result in plaintiff's termination. The Chancellor's Committee found that the 2015 unsatisfactory rating was based on acts of professional misconduct, which included the January 7, 2015 physical altercation, plaintiff's intimidation of Grant, and failures to report to assigned teaching periods and meetings with Ficalora. (ECF No. 31-21, Ex. U at 4.) Plaintiff's employment was not terminated after these documents were issued, and it is undisputed that plaintiff continued her employment during the next school year.

Plaintiff claims that she "lost her job and received only a reduced pension, because she was terminated from employment due to a medical examination that Ficalora requested." (Opp. at 15.) The undisputed record, however, establishes that plaintiff stopped coming to work on October 8, 2015. (ECF No. 38-2, Ex. B; ECF No. 31-25, Ex. Y.) Plaintiff's doctor stated on October 13, 2015 that she was "fully disabled" and "unable to return to her job" due to "post-traumatic stress disorder and depressive disorder." (ECF No. 38-1, Ex. A.) Ficalora subsequently requested a medical examination, which included reasons beyond the conflicts with Grant. (ECF No. 38-2, Ex. B.) Plaintiff thereafter had a medical examination on April 12, 2016 and was found "not fit for personal illness" for

her job.  (ECF No. 31-25, Ex. Y.)  Plaintiff has, therefore, failed to establish a prima facie case of discrimination.

Even assuming that plaintiff had established a prima facie case, defendants have offered legitimate, nondiscriminatory reasons regarding the circumstances under which plaintiff's employment ceased.  Defendant requested a medical evaluation to determine plaintiff's "mental and physical capacity to perform her duties," citing plaintiff's long absence; plaintiff's physical altercations with students; plaintiff's conflicts with Grant; plaintiff's harassing phone calls made to another employee; and plaintiff's fantastic statements regarding mind control and surveillance made to another employee.  (ECF No. 38-2, Ex. B.)

Although plaintiff treats defendants' request for a medical evaluation as the trigger for her unemployment, the record demonstrates otherwise.  Defendant requested a medical examination only after plaintiff herself had been absent from work 96 days.  The medical evaluation found that plaintiff was not fit for work "for personal illness."  Defendants may have requested an evaluation based on events that plaintiff characterizes differently from defendants, but her health, as she and her doctor have both acknowledged, is why she no longer works.

The court acknowledges that plaintiff disputes Ficalora's conclusions regarding the disciplinary letters in her files and her unsatisfactory rating, and that she contests most of the defendants' descriptions of events involving the plaintiff as hearsay. Courts, however, are "decidedly not interested in the truth of the allegations against plaintiff." *McPherson v. New York City Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006). Rather, "[w]e are interested in what 'motivated the employer,' the factual validity of the underlying imputation against the employee is not at issue." *Id.* (citing *United States Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 716, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983) (emphasis added) (internal quotations omitted)). The Second Circuit's ruling in *McPherson* addressed an "attack . . . on the legitimacy of the reasons, specifically, DOE's reliance on hearsay evidence contained in the . . . investigatory report" regarding "investigatory conclusions that [plaintiff] used corporal punishment[.]" *Id.* at 215. The court noted that although "bizarre or duplicitous processes might strengthen a plaintiff's showing of pretext," there was no such showing because in the business context "reliance on evidence (such as hearsay) that would be excluded by the Federal Rules of Evidence is insufficiently arbitrary and aberrant to support an inference of pretext." *Id.* at 216 n.7.

Plaintiff generally disputes Ficalora's conclusions by critiquing his investigatory process. But plaintiff offers no evidence of a bizarre and duplicitous process, motivated by animus based on race, ethnicity, national origin, or disability, that supports an inference of pretext. Moreover, the record demonstrates that the process plaintiff participated in included an appeal of plaintiff's unsatisfactory rating for the 2014-15 school year, and the rating was sustained by the Chancellor's Committee.

Defendants are, therefore, entitled to summary judgment on plaintiff's race and national origin discrimination claims.

## III. Hostile Work Environment under Title VII and the NYSHRL

"Hostile work environment claims under Title VII and the NYSHRL are governed by the same standard." *Tolbert v. Smith*, 790 F.3d 427, 439 (2d Cir. 2015). "To establish a prima facie case of hostile work environment, the plaintiff must show that the discriminatory harassment was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' and 'that a specific basis exists for imputing' the objectionable conduct to the employer." *Id.* (citing *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)). "It is axiomatic that the plaintiff also must show that the hostile conduct occurred because of a

protected characteristic." *Id.* (citing *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002)).

To determine whether a work environment is sufficiently hostile, "courts consider the totality of the circumstances, including such factors as '(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether the conduct was physically threatening or humiliating, or a mere offensive utterance; (4) whether the conduct unreasonably interfered with plaintiff's work; and (5) what psychological harm, if any, resulted.'" *Lumhoo v. Home Depot USA, Inc.*, 229 F. Supp. 2d 121, 152 (E.D.N.Y. 2002) (citing *Richardson v. New York State Dep't of Correctional Serv.*, 180 F.3d 426, 437 (2d Cir. 2002)). "The incidents at issue must be 'more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Bacchus v. New York City Dep't of Educ.*, 137 F. Supp. 3d 214, 240 (E.D.N.Y. 2015) (citing *Das v. Consolidated School Dist. of New Britain*, 369 F. Appx 186, 190 (2d Cir. 2010)).

"In other words, '[s]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.'" *Illiano v. Mineola Union Free Sch. Dist.*, 585 F. Supp. 2d 341, 350 (E.D.N.Y. 2008) (citing *Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998)). "[U]nder the law, an

unpleasant work environment does not amount to a hostile one."
*Mauze v. CBS Corp.*, 340 F. Supp. 3d 186, 214 (E.D.N.Y. 2018).

Defendants argue that they are entitled to summary
judgment on plaintiffs' hostile work environment claims because
the only remarks that touched on a protected characteristic
(Grant's "China girl" and roach comments in September 2013 and
Kouril's "crazy" comment in May 2015), were sporadic and
episodic. (Mem. at 21-22.) Defendants argue that the letters
in plaintiff's file and the unsatisfactory rating are not
sufficient to establish a hostile work environment. (*Id.* at
22.) They further assert that plaintiff's conflicts with Grant
do not support a hostile working environment because they were
based on personality conflicts, rather than animus based on a
protected characteristic. (*Id.* at 23.)

Plaintiff argues that the totality of the
circumstances includes not only the three remarks, but also
Ficalora's failure to investigate, address, and report the
remarks. (Opp. at 23.) Plaintiff also contends that Ficalora
failed to investigate the various events involving plaintiff and
did not take her claims seriously. (*Id.* at 23-25.) Plaintiff
argues that there is evidence from which a jury could find that
her conflicts with Grant were based on Grant's hostility related
to plaintiff's race and national origin. (*Id.* at 23-24.)
Plaintiff argues that she suffered concerted and ongoing

harassment by Grant and Ficalora because Ficalora did not punish Grant for her September 2013 comments and because Ficalora insufficiently investigated their future conflicts. (*Id.* at 24.) Plaintiff also notes that all of these events affected her work performance, leading to her medical issues and request for a transfer. (*Id.* at 25.)

Plaintiff provides evidence of only four isolated incidents which reference a protected category: Grant's two offensive comments regarding Chinese people in September 2013, Kouril's sole offensive comment about mentally challenged individuals in May 2015, and Levitan's inappropriate question regarding the race or ethnicity of plaintiff's doctors. None of these incidents alone, or in combination, is severe enough to establish a hostile working environment. They were sporadic events involving offensive and insensitive comments.

Plaintiff does not provide evidence that any of her disputes with Grant, after Grant's first two offensive comments, were related to race or another protected characteristic, and testified that Grant did not make any comments based on her race or national origin during the 2012-13 school year after those two incidents. (Pl. Counterstatement ¶ 18.) Furthermore, plaintiff rejected the characterization of her conflicts with Grant as "constant," highlighting that there were "three incidents over a period of time." (Pl. Counterstatement ¶ 57.)

No jury could conclude that plaintiff was subjected to continuous and concerted hostility based on the record before the court.

Plaintiff takes issue with the disciplinary letters and unsatisfactory rating she received, but the undisputed record establishes that Ficalora first investigated the complaints before issuing the disciplinary letters and unsatisfactory rating. Plaintiff's disagreement with Ficalora's methods and conclusions does not establish the existence of a hostile working environment. Plaintiff's belief that she was without fault is not evidence that she was subjected to hostile conduct on the basis of a protected ground. "To prove a hostile work environment claim . . ., a plaintiff must show that [her] 'workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Wiercinski v. Mangia 57, Inc.*, 787 F.3d 106, 113 (2d Cir. 2015) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). In the light most favorable to the plaintiff and under a totality of the circumstances, plaintiff has not demonstrated a sufficiently hostile and pervasive environment.

Defendants are entitled to summary judgment on plaintiff's federal and state hostile working environment claims.

## IV.  Retaliation

The court considers plaintiff's retaliation claim based on events after April 24, 2015.

Federal and state retaliation claims are also governed by the *McDonnell Douglas* framework.  *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013).  To establish a *prima facie* case of retaliation, a plaintiff must show (1) participation in a protected activity; (2) the defendant's knowledge of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.  *Id.* at 844.  Once the plaintiff establishes a prima facie showing, the burden shifts to the employer to articulate some legitimate, non-retaliatory reason for the employment action.  *Id.* at 845 (citing *United States v. Brennan*, 650 F.3d 65, 93 (2d Cir. 2011).  After a non-retaliatory reason has been articulated, the presumption of retaliation drops, and the plaintiff must then demonstrate the non-retaliatory reason is a mere pretext for retaliation.  (*Id.*)

A plaintiff "alleging retaliation in violation of Title VII must show that retaliation was a 'but-for' cause of

the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision." *Id.* (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)).  This does not require proof that retaliation was the only cause for the employer's action, but that the adverse action would not have occurred absent the retaliatory motive. *Id.* at 846.  "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Id.*

"The temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation under Title VII, but without more, such temporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext." *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010).  "[E]mployer actions prohibited by Title VII's anti-discrimination provision are limited to conduct that affects the terms and conditions of employment, while under Title VII's anti-retaliation provision, the challenged action need not affect the terms and condition of employment in order to constitute unlawful retaliation." *Siddiqi v. New York City Health & Hosps. Corp.*, 572 F. Supp. 2d 353, 372 (S.D.N.Y. 2008)

(citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63-64 (2006)). "[F]or the purposes of a retaliation claim, bad performance reviews are an adverse employment action." *Id.*

There is no dispute that the defendants were aware of plaintiff's complaints regarding Grant and her SDHR complaint, the filing of which is a protected activity. Plaintiff received her unsatisfactory performance rating after April 24, 2015. In the retaliation context, this suffices as an adverse employment action. Plaintiff was also ultimately declared not fit to work in April 2016.

Defendants have articulated legitimate, non-retaliatory reasons for plaintiff's unsatisfactory performance evaluation and the circumstances under which her employment ceased. As discussed above, the unsatisfactory rating was based on a litany of plaintiff's activities, including physical altercations with students. (*See* ECF No. 31-21, Ex. U.) Plaintiff's lack of fitness was determined by a medical exam that confirmed what plaintiff's own doctor had already concluded, after she had left the school over 90 days earlier. The medical finding did not itself cause her to be removed from her position because she had already left, but it retroactively approved plaintiff's ongoing absence. The medical evaluation was ordered after plaintiff abandoned her post and after she inspired concern among school employees. (ECF No. 38-2, Ex. B.)

39

Plaintiff has offered no proof that her ultimate termination would not have occurred absent her filing of the SDHR complaint.

Plaintiff's contends that the retaliation began not after she complained to Ficalora in October 2013 or filed her SDHR complaint in April 2014, but after the SDHR concluded its investigation in September 2014. (Opp. at 24-25.) This temporal proximity, without more, cannot establish pretext.

Defendants are entitled to summary judgment on plaintiff's retaliation claims under Title VII and the NYSHRL.

## V. Discrimination, Retaliation, and Hostile Work Environment under the NYCHRL

The NYCHRL makes it "unlawful for an employer or an employee or agent thereof" to discharge an employee based on, *inter alia*, the employee's race or national origin. N.Y.C. Admin. Code § 8-107(1)(a). It is also unlawful to discriminate against such person in "terms, conditions or privileges of employment." *Id.*

Under the NYCHRL, "an employer is strictly liable for the unlawful harassment of employees by their supervisors or managers, regardless of whether the harassment culminates in a tangible employment action," and individual employees may also be held liable "if they actually participated in the conduct giving rise to the discrimination claim." *Dillon v. Ned Mgmt., Inc.*, 85 F. Supp. 3d 639, 657, 658 (E.D.N.Y. 2015).

Although the NYCHRL was formerly construed to be coextensive with its federal and state counterparts, the law was amended in 2005 and requires an independent analysis as amended. *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013). Courts must construe the NYCHRL's provisions "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible[.]" *Id.* (citing *Albunio v. City of New York*, 16 N.Y.3d 472, 477-78 (2011)). "[E]ven if the challenged conduct is not actionable under federal and state law, federal courts must consider separately whether it is actionable under the broader New York City standards." *Id.*

Courts should consider the totality of the circumstances "because the overall context in which the challenged conduct occurs cannot be ignored." *Id.* at 113 (citation and internal quotation marks omitted). The NYCHRL is not a general civility code, and a defendant is not liable if the plaintiff fails to prove the conduct is caused at least in part by discriminatory or retaliatory motives, or if the defendant proves the conduct was nothing more than petty slights or trivial inconveniences. *Id.* (citations omitted). Although a court may still dismiss truly insubstantial cases, even a single comment may be actionable in the proper context. *Id.* (citation omitted). "[S]ummary judgment is still appropriate in NYCHRL

cases, but only if the record establishes as a matter of law that a reasonable jury could not find the employer liable under any theory." *Id.* (citation omitted).

"New York courts seeking to heed the [broad construction] command have approached discrimination and retaliation claims under a similar framework. In both situations, the plaintiff must establish a prima facie case, and the defendant then has the opportunity to offer legitimate reasons for its actions." *Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 75-76 (2d Cir. 2015). "If the defendant satisfies that burden, summary judgment is appropriate if no reasonable jury could conclude either that the defendant's 'reasons were pretextual,' . . . or that the defendant's stated reasons were not its sole basis for taking action, and that its conduct was based at least 'in part on discrimination[.]'" *Id.* (citations omitted).

"NYCHRL's retaliation provision is broader than Title VII's[,] protecting plaintiffs who 'oppos[e] any practice forbidden under' the law from conduct 'reasonably likely to deter a person engaging in such action.'" *Id.* at 76 (citing *Mihalik*, 715 F.3d at 112). "While the NYCHRL has a less demanding standard [for retaliation], a 'plaintiff still must establish that there was a causal connection between [her] protected activity and the employer's subsequent action, and

must show that a defendant's legitimate reason for [her] termination was pretextual or motivated at least in part by an impermissible motive.'" *Hughes v. Twenty-First Century Fox, Inc.*, 304 F. Supp. 3d 429, 449 (S.D.N.Y. 2018) (citation omitted).

Plaintiff's career ended not as a result of her filing a complaint with the New York State Division of Human Rights, but after she left her employment and after two medical examinations, one by her psychiatrist and one requested by Ficalora, found that she was unable to work due to her illness. Moreover, plaintiff's career ended after plaintiff had abandoned her post, was involved in physical altercations with students, and engaged in behavior that alarmed several of her co-workers, including employees who are not defendants in this action. Plaintiff has not offered evidence establishing that the reason for termination was pretextual or motivated, even in part, by an impermissible motive, and no reasonable jury could conclude otherwise.

"Hostile work environment claims are analyzed under the same provision of the NYCHRL as discrimination claims." *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 261 (E.D.N.Y. 2012), *aff'd,* 713 F.3d 163 (2d Cir. 2013). "Under the NYCHRL, defendants' discriminatory conduct need not be severe or pervasive to create an actionable hostile work environment[,]"

and the relevant question is "whether there is a triable issue of fact as to whether the plaintiff has been treated less well than other employees because of her race [or] national origin." *Id.* (citation and internal quotation marks omitted).

Defendants can avoid liability under the NYCHRL by proving that the conduct complained of "consists of nothing more than what a reasonable victim of discrimination would consider petty slights and trivial inconveniences." *Id.* (citation and internal quotation marks omitted). "Isolated incidents of unwelcome verbal and physical conduct have been found to constitute the type of 'petty slights and trivial inconveniences' that are not actionable even under the more liberal NYCHRL standard." *Russo v. New York Presbyterian Hosp.*, 972 F. Supp. 2d 429, 450 (E.D.N.Y. 2013)

Although letters to file and evaluations do not rise to the level of materially adverse employment actions, they are more than petty or trivial. *Sotomayor*, 862 F. Supp. 2d at 258. But here, plaintiff has not created a triable issue of fact as to whether she was treated less well than other employees. Regarding plaintiff's disputes with Grant, plaintiff was warned about her behavior when Ficalora concluded that she was at fault, just as Ficalora directed Grant to refrain from using racially inappropriate language when Ficalora credited plaintiff's accusations. Plaintiff has not provided evidence

44

that other employees had physical altercations with students and failed to receive corporal punishment charges.  Plaintiff also has not offered evidence that other teachers with a history of missing appointments and engaging in corporal punishment failed to receive an unsatisfactory rating.

Kouril's statement to plaintiff was an isolated incident.  Moreover, plaintiff concedes that Kouril was not aware of her diagnosis, so it was not tied to a protected characteristic.

For the foregoing reasons, defendants are granted summary judgment on plaintiff's discrimination, retaliation, and hostile work environment claims under the NYCHRL.

## VI.  Disability Discrimination in Violation of the ADA, NYSHRL & NYCHRL

"Claims alleging disability discrimination in violation of the ADA are subject to the burden-shifting analysis originally established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir.2009).  "A plaintiff must establish a prima facie case; the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the discharge; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a

pretext." *Id.* (citing *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006)).

"Discrimination in violation of the ADA includes, *inter alia,* 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability.'" *Id.* (citing 42 U.S.C. § 12112(b)(5)(A)). A plaintiff makes a prima facie case for failure to accommodate by showing that (1) plaintiff is a person with a disability under the meaning of the ADA; (2) the employer subject to the statute had notice of plaintiff's disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer refused to make such an accommodation. *Id.* at 96-97. "Once a plaintiff has established a *prima facie* case, the burden shifts to the defendant to show '(1) that making a reasonable accommodation would cause it hardship, and (2) that the hardship would be undue.'" *Krachenfels v. N. Shore Long Island Jewish Health Sys.*, 2014 WL 3867560, at *11 (E.D.N.Y. July 29, 2014) (citing *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 6 (2d Cir. 1999)).

"The ADA envisions an interactive process by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated." *Jackan v. New York State Dep't of Labor*, 205 F.3d 562, 566 (2d Cir.

2000) (internal quotation marks omitted). "[A]n ADA plaintiff complaining of [her] employer's failure to provide a reasonable accommodation, bears both the burden of production and the burden of persuasion on the question whether a suitable vacancy existed at the time [she] sought transfer." *Id.* at 567. A plaintiff "does not satisfy her burden to identify a potential accommodation merely by reciting the formula that her employer could have reassigned her," and instead "must demonstrate the existence, at or around the time when accommodation was sought, of an existing vacant position to which she could have been reassigned." *McBride*, 583 F.3d at 97-98. "[A]n employee may not recover based on [her] employer's failure to engage in an interactive process if [she] cannot show that a reasonable accommodation existed at the time of [her] dismissal." *McElwee v. Cty. of Orange*, 700 F.3d 635, 642 (2d Cir. 2012).

"[T]he employer's decision to engage in or forgo an interactive process is but one factor to be considered in deciding whether a reasonable accommodation was available for the employee's disability at the time the employee sought accommodation." *Jacobsen v. New York City Health & Hosps. Corp.*, 22 N.Y.3d 824, 838 (2014). "Without having participated in [the interactive] process in response to the employee's request, the employer cannot prevent the employee from bringing a State HRL claim to trial on the reasonable accommodation

47

issue, but on the other hand, the employee cannot obtain a favorable jury verdict or summary judgment solely based on the employer's failure to engage in an interactive process." *Id.*

The parties do not dispute that plaintiff had a disability and that the defendants were aware of it. Plaintiff's accommodation request for a transfer was denied twice. Plaintiff testified in her deposition that she was aware of other openings, even if not specifically in Queens, and that she had applied for positions. Plaintiff has established a prima facie case for her failure to accommodate claims under the ADA and NYSHRL. Defendants have not demonstrated that granting a transfer would have caused an undue hardship. Furthermore, there is no evidence in the record that defendants engaged in an interactive process regarding plaintiff's accommodation request. Defendants are denied summary judgment on the federal and state failure to accommodate claims.

"[U]nlike the State HRL, the City HRL places the burden on the employer to show the unavailability of any safe and reasonable accommodation and to show that any proposed accommodation would place an undue hardship on its business." *Id.* at 835. "[B]ecause the City HRL provides broader protections against disability discrimination than the State HRL, the City HRL unquestionably . . . forecloses summary judgment where the employer has not engaged in a good faith

interactive process regarding a specifically requested accommodation." *Id.* at 837-38.

Defendants have not demonstrated the unavailability of a safe and reasonable accommodation or shown that a transfer would have caused an undue hardship. Defendants are denied summary judgment on the plaintiff's failure to accommodate claims under the NYCHRL, NYSHRL, and ADA.

### CONCLUSION

For the foregoing reasons, the court grants defendants' motion for summary judgment regarding plaintiff's claims of discrimination on the basis of race and national origin, hostile work environment, and retaliation under federal law, state law, and the NYCHRL. The court denies defendants' motion regarding plaintiff's failure to accommodate claims. The parties are directed to file a status letter 30 days after this order is entered and should inform the court whether they wish to proceed to trial or a settlement conference.


**SO ORDERED.**


Dated:     September 27, 2019
           Brooklyn, New York


                                   _____/s/_____
                                   **HON. KIYO A. MATSUMOTO**
                                   United States District Judge
                                   Eastern District of New York